The BOARD OF REGENTS OF the UNIVERSITY OF NEBRASKA, Appellee,

v.

A. Neil DAWES, and all Extension Employees at the University of Nebraska College of Agriculture who are similarly situated, Appellants.

No. 75–1126.

United States Court of Appeals, Eighth Circuit.

Submitted June 13, 1975.

Decided Aug. 26, 1975.

Rehearing Denied Sept. 23, 1975.

Certiorari Denied Feb. 23, 1976.
See 96 S.Ct. 1112.

Robert B. Crosby, Lincoln, Neb., for appellants.

L. Bruce Wright, Lincoln, Neb., for appellee.

Before LAY, HEANEY and STEPHENSON, Circuit Judges.

HEANEY, Circuit Judge.

This action arises out of a suit for declaratory judgment brought by the Board of Regents of the University of Nebraska (University) seeking a determination of the rights and status of the parties under the Equal Pay Act of 1963, 29 U.S.C. § 206(d)(1).[1] The essential issue is whether the University unlawfully discriminated against the male professional employees of the College of Agriculture and Home Economics when it sought to equalize salaries paid to the male and female employees of those colleges. The University established and put into effect a formula for determining a minimum salary schedule based on education, experience and merit for females then employed by the colleges but refused to put into effect the same formula for determining the minimum salaries of males then employed. We hold that this constituted unlawful discrimination and reverse the District Court.

In the spring of 1972, the University became aware of the problems encountered by the University of Wisconsin when it was investigated and found in violation of the Civil Rights Act of 1964. The University of Wisconsin was found to have unlawfully discriminated against women in setting salaries when it underwent a compliance review conducted by the United States Department of Health, Education and Welfare. The University, to avoid similar problems, determined to undertake a review of its salary structure and make such adjustments as necessary to eliminate salary discrimination based on sex in order to avoid the possible loss of federal funds. Directives were sent through administrative channels until they reached the Deans of the Colleges of Agriculture and Home Economics. These colleges referred the matter to a joint committee for study.

The committee, after intensive study, concluded that they could best determine whether inequities existed through a three-step process: first, identify comparable jobs; second, examine the salaries of the males and identify and assign a monetary value to the factors which went into determining their salaries; and third, compare the average male salary with individual female salaries based on a formula developed through the first two steps of the process.

In identifying comparable jobs, the committee decided that exact one-to-one comparisons were impractical. They determined that they could classify the employees according to whether they were Academic Research and Extension Specialist Staff or Extension Field Staff; i. e., Specialist Staff or Field Staff.

In the second step, the committee determined that education, specialization, years of direct and related experience and merit were the factors which logically determined a male professional's salary. In order to assign a monetary value to these factors, the committee made a determination that Doctors of Philosophy with no experience were being hired at $14,000. Of that $14,000, $8,000 represented the value of a Bachelor's degree, $2,000 represented the value of a Master's degree, $3,000 represented the value of a Doctor's degree and $1,000 represented the value of specialization.[2] The

---

1. By order of the United States District Court, District of Nebraska, on agreement of the parties, the matter was designated a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2). The defendant class counterclaimed and sought recovery for alleged unpaid wages, liquidated damages, interest and reasonable attorney fees. The University denied the class claim and pled the defense of

sovereign immunity under the Eleventh Amendment. The trial court held that the defendant class had not proved a violation of the Act and hence found it unnecessary to determine the Eleventh Amendment issue.

2. All Ph.D's were credited with $1,000 for specialization. The committee also credited personnel holding the position of County Agent

portion of salary allocated to education and specialization for each male was computed according to the above scale and totaled separately for the Specialist Staff and Field Staff. Those totals were then subtracted from the total salaries paid to the respective staffs. The remainders were considered to represent that portion of the total salaries attributable to experience and merit.

The committee then developed a formula to express the average value of experience and merit for each of the staffs. The committee assigned three points for each year of direct experience and one and one-half points for each year of related experience. The number of experience points for each male was calculated and totaled separately for each staff. The committee then divided the separate experience points of each staff by the respective total of the average individual annual performance ratings (merit)[3] which were based on a one-to-five scale with one indicating the highest level of achievement. The quotient gave the total "experience rating points" for the two staffs. The remainders representing the portion of salary attributed to experience and merit were then divided by the respective totals of the "experience rating points" which resulted in allocating $120.00 for each "experience point" of a member of the Field Staff and $106.00 for each "experience rating point" of a member of the Specialist Staff.

The committee was then in a position to set forth a formula by which it could compare an actual individual female salary with a hypothetical average male salary based only on education, speciali-

zation, experience and merit. The formula can be expressed as follows:

*Field Staff*

$$A + B + \left[\frac{(3 \times C + 1.5 \times D)}{E} \times \$120.00\right] = \text{Salary}$$

*Specialist Staff*

$$A + B + \left[\frac{(3 \times C + 1.5 \times D)}{E} \times \$106.00\right] = \text{Salary}$$

A = Education;   B = Specialization; C = Years of Direct Experience; D = Years of Related Experience; E = Merit (individual annual performance rating).

The committee performed the calculations for each of the one hundred twenty-five females and determined that thirty-three of the female employees were receiving less than the formula salary. The difference between formula and actual salary was considered the amount necessary to equalize male and female salaries.[4]

The committee completed its work in April of 1972. The University, then faced with the problem of what to do with the committee's findings in budgeting salaries for the fiscal year beginning on July 1, 1972, decided to implement the committee's findings. Accordingly, effective July 1, the salaries of the thirty-three females were increased to the formula level. This "equalization" raise was to be effected prior to any other salary increases. The female professionals also received a $300.00 increase which had been mandated for male and female professionals by the legislature.

This process had a twofold effect: It established an "average"[5] male formula salary as the minimum salary for females and it left a number of males re-

Chairmen in the Field Extension Staff category with $1,000 for specialization although such personnel did not have Ph.D. degrees. The added amount in such cases represented administrative responsibility.

3. The individual annual performance rating is a consensus of the ratings made by a professional employer's immediate supervisor. The annual performance ratings are kept on file by the University personnel office.

4. All of the committee's calculations were based on the 1971–1972 fiscal year salaries.

5. We use the term "average" guardedly since it is not the true average of the males but rather a weighted average. The education attainment and specialization factors distort the "average."

ceiving less than the formula salary. In fact, of the two hundred seventy-two males whose salaries were used as the base, ninety-two of them received less than the formula.[6] It is these males who contend that the University has violated the Equal Pay Act by not applying the formula to them.

A resolution of this case depends upon a proper application of the Equal Pay Act. 29 U.S.C. § 206(d)(1)[7] provides:

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided*, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

The University contends that the male employees of the class have failed to es-

tablish by a preponderance of the evidence, that the female employees were compensated at a different rate, that they were employed in the same establishment, and that they were engaged in jobs, the performance of which required equal skill, effort and responsibility. It further argues that the thirty-three female professionals received a one-time salary adjustment and that henceforth it will return to its traditional method of salary determination—individual negotiation considering education, experience, special skill, merit and market conditions (supply and demand). Thus, the University contends that there was no violation of the Act.[8]

■ In our view, the defendant class has carried its burden of proof and has established that the members of the class were unlawfully discriminated against.[9] They proved that the University had established a minimum salary schedule for all presently employed female professionals in the Colleges of Agriculture and Home Economics and that at least thirty-three of that group were placed on that schedule. They further proved that at least ninety-two male professionals (having substantially equivalent education, experience and merit) were retained by the two colleges at a wage less than the minimum established for the females. This proof was sufficient to establish a violation of the Equal Pay Act.

■ It was the University, not the defendant class, that established the

---

6. In the trial court's memorandum, it is stated that eighty-five males received less than the formula salary. This is apparently a typographical error. The correct figure is ninety-two.

7. Congress amended the Fair Labor Standards Act, 29 U.S.C. § 213(a), effective July 1, 1972, so as to eliminate the exemption provision which had provided that the sex discrimination provision of the Equal Pay Act, 29 U.S.C. § 206(d)(1) would not apply to professional employees.

8. We note that the evidence as to the existence of sex discrimination at the University of

Nebraska prior to these events is conflicting. Dr. Virginia Trotter, former Dean of the College of Home Economics, contended at the trial that the committee had found discrimination. Dr. John Adams, Director of the Cooperative Extension Service and chairman of the committee, indicated that there has been no discrimination against females.

9. We agree with the University that the burden of proof rested on the defendant class even though the University had initiated the declaratory judgment action. *Reliance Life Insurance Co. v. Burgess*, 112 F.2d 234 (8th Cir. 1940).

ground rules for determining whether women were being discriminated against. It determined the factors that were considered to be important for that purpose. It cannot now be heard to complain that some other additional factors must also be considered when the question is one of discrimination against the male employees who are being paid less than the formula minimum.

The University asserts that the "glaring fallacy" in the approach of the defendant class is that the formula does not represent the actual compensation paid to either male or female employees. It is in error in this assertion. On July 1, 1972, thirty-three women were placed on a step of the "salary schedule" consistent with their education, experience and merit rating solely because they were women and for no other reason— not because they had more administrative duties, taught more difficult subjects or worked harder and not because they were better teachers, researchers or field agents.[10]

It is, of course, true that there were and are male and female teachers who receive salaries in excess of those obtained by applying the formula. It may even be that a careful comparison of these professionals would uncover inequities as between the sexes, but we are not concerned with that problem on this appeal. It is not necessary to prove that all of the persons of one sex employed by a single employer are discriminated against to establish a violation of the law. It is sufficient to show that some are.

We, of course, do not hold or imply that a University must establish salary schedules or even minimum salaries.

10. The trial court found that on July 1, 1972, the average male was paid $1,337 per year above the formula and that the average female was paid only $744.00 above the formula. It concluded from these averages that there was no violation of the Equal Pay Act with respect to the men. The averages, if correct, would be largely irrelevant since all the females were paid at least the minimum set in the formula and ninety-two men who performed substantially equal work received less than that minimum.

We simply hold that when a University establishes and effectuates a formula for determining a minimum salary schedule for one sex and bases the formula on specific criteria such as education, specialization, experience and merit, it is a violation of the Equal Pay Act to refuse to pay employees of the opposite sex the minimum required under the formula.

In the light of our decision, the other points raised by the University are without merit and need no discussion. We express no opinion as to the merits of the University's Eleventh Amendment defense as the trial court did not rule on the issue. The decision of the District Court is reversed and the case is remanded for action consistent with this opinion.

We also doubt the correctness of the averages. It appears that the average should be:

Moreover, the average male salary was apparently computed to include the $300.00 legislatively-mandated increase while the average female salary was apparently computed without the increase.