Peter J. BRENNAN, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

SEARS, ROEBUCK AND COMPANY, a corporation, Defendant.

Civ. No. 71–C–2025–C.

United States District Court, N. D. Iowa, C. D.

Jan. 7, 1976.

Dept. of Labor, Nashville, Tenn., for plaintiff.

Kalvin M. Grove, Chicago, Ill., Donald J. Spero, Skokie, Ill., Lee W. Rosebrook, Des Moines, Iowa, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HANSON, Chief Judge.

The Secretary of Labor brought this action under Section 17 of the Fair Labor Standards Act of 1938 (Act of June 25, 1938, c. 676, 52 Stat. 1060, as amended; 29 U.S.C. § 201 et seq.), alleging that the defendant, Sears, Roebuck and Company (Sears), has violated the Act's equal pay provisions (Section 6(d)), by maintaining an unlawful wage differential at its Fort Dodge store between certain of its men and women employees. The Secretary seeks back wages for female division managers and salespersons at the Fort Dodge store for the period from April 30, 1968, to the present, and an injunction against the company enjoining equal pay violations at any of its stores. This Court has jurisdiction under 29 U.S.C. § 217 (1970).

On March 14, 1974, this Court ordered the issues of liability and remedy severed for trial. The liability issue—i. e., whether the company has in fact committed any violations of the Equal Pay Act at its Fort Dodge store—was tried to the Court, sitting without a jury, on July 23 to 31, 1974. Based upon the oral testimony at trial, the deposition testimony submitted to the Court, exhibits introduced by both parties, and all of the files, records, and proceedings herein, the Court makes and enters its Findings of Fact and Conclusions of Law as follows, in accordance with Rule 52 of the Federal Rules of Civil Procedure.

Sears is a New York corporation which owns, controls, and operates a nationwide chain of some 900 retail stores, including a store at the Crossroads Center shopping center in Fort Dodge, Iowa. The Sears stores are divided into five administrative regions—the Eastern, Far West, Southern, Southwestern, and Midwestern territories. The Fort Dodge store is located in the Midwestern territory.

The parties agree that Sears is an enterprise engaged in commerce or in the production of goods for commerce, within the meaning of 29 U.S.C. §§ 203(r); 203(s)(1) of the Fair Labor Standards Act, and that Sears is an "employer" within the meaning of 29 U.S.C. § 206.

For the purposes of this lawsuit, Sears' Fort Dodge store is one "establishment" within which jobs and wages may be compared. 29 C.F.R. § 779.23. See Hodgson v. Robert Hall Clothes, Inc., 326 F.Supp. 1264, 1268–69 (D.Del.1971), rev'd on other grounds, 473 F.2d 589 (3d Cir. 1973). This case involves Equal Pay Act issues affecting the wages of two types of employees at the Fort Dodge store: divisions managers and salespersons.

In 1972, Sears brought the administration of wage differentials in each of its 900 stores under one national program, entitled its "Equal Pay Affirmative Action Plan for Retail Units" (the Plan). Prior to implementation of the Plan, salesperson and division manager salaries in any given store were determined primarily at the local level, with the store manager in each unit playing a crucial role in the salary decisions affecting that unit's employees. Because the Plan significantly changes Sears' salary determination methods, two separate time periods must be considered in comparing the male-female wages at issue in this case; the dividing line is the implementation of the 1972 plan.

This suit was filed on April 30, 1971. Assuming a willful violation of the Act by Sears, the Court's comparison of salaries can extend back three years, to April 30, 1968. 29 U.S.C. § 255(a) (1970). (A two-year statute of limitations applies to non-willful violations. Id.) Thus, the two time periods involved are: (1) from April 30, 1968 to implementation of the Plan in 1972; (2) implementation of the Plan to the present time. The Court will divide its discussion of the Secretary's allegations of Equal Pay Act violations into three parts. First, the Court considers division manager violations

from 1968 to 1972; second, salesperson violations from 1968 to 1972; and third, division manager and salesperson violations after implementation of Sears' affirmative action plan.

## DIVISION MANAGERS: 1968–1972

The Secretary alleges Equal Pay Act violations involving fourteen Fort Dodge store division managers: 6 women and 8 men. Since at least April 30, 1968, the men and women listed below have held the following division manager assignments at the Fort Dodge store:

| FEMALES | DATES OF ASSIGNMENT AND DIVISIONS ASSIGNED TO MANAGE |
|---|---|
| 1. Marguerite Rolow | 8/1/64 to 1/71, # 7, 17, 19, 31, Juniors' and Women's Wearing Apparel. |
| 2. Virginia Graybill | 2/3/64 to present, # 29, 77, Infants', Childrens', Girls and Young Juniors Wearing Apparel. |
| 3. Clarice Schaller | 3/29/67 to 5/72, # 18, Foundations, # 38, Lingerie; 5/72 to present, # 18, 38, 75, Foundations, Lingerie, and Hosiery. |
| 4. Norma Lundberg | 4/22/68 to 2/7/72, # 24, 96, Draperies, Bedspreads, Domestics, Bed Pillows, Bath Shop; 2/7/72 to present, # 21, (Gifts & China) 24, 96. |
| 5. Adeline Quist | 1/3/71 to 2/18/73, # 7, 17, 19, 31, Juniors' and Womens' Wearing Apparel, 2/19 to present, # 7, 17, 19, 31, 3, 4, 8, 14, 25, 36, 88, Juniors' and Women's, Stationery, Photography, Office Supplies, Jewelry, Cosmetics, Luggage, Notions, Patterns and Yard Goods, Fashion Accessories. |
| 6. Erna Blankenhagen | 4/22/68 to 2/3/69, # 40, Boys' Apparel. |
| **MALES** | |
| 1. Gary Prochaska | 9/67 to 7/69, # 3, 14, 15, Stationery, Photograph, Office Equipment, Luggage, Shoes; 7/69 to 1/70, # 30, 34, Paints, Electrical Supplies; . . . 6/1/70, # 11, 30, 34, Housewares, Paints, Electrical Supplies; 2/10/72, Transferred. |
| 2. Michael Verchio | 9/9/68, # 33, 41, 45, 51, Men's Furnishings, Sportswear, Coats, Suits, Work Clothing; 2/1/69, # 33, 41, 45; 4/1/69, # 33, 41, 45, 71, Men's divisions and Garden Shop; 8/1/69, # 33, 40, 41, 45, 71, Men's, Boys', and Garden Shop; 2/1/70, # 33, 40, 41, 45 (48), Men's, Boys', and Teenage Boys; 8/2/71, Transferred. |
| 3. Thomas Segreto | 6/28/71 to present, # 33, 40, 41, 45, 48, Men's Furnishings and Wearing Apparel, Boys' and Teenage Boys'. |
| 4. Richard Whiting | 1/1/68 to 8/10/68, # 33, 41, 45, 51, Men's Furnishings, Sportswear, Coats and Suits, Work Clothing. |

5. Kenneth Ryerson — 11/4/68, # 6, Sporting Goods; 2/1/70, # 6, 49, Sporting Goods, Toys; 11/1/70, to 2/6/72, # 6, Sporting Goods; 3/1/73 to present, # 6, 49, 51, 71, Sporting Goods, Toys, Work Clothes, Garden Shop.

6. Richard Flack — 9/1/68 to 11/68, # 6, 49, 71, Sporting Goods, Toys, Garden Shop.

7. Michael Brown — 10/1/72 to at least 6/73, # 15, Shoes.

8. John Christians — 2/7/72 to 9/23/72, # 15, Shoes.

Sears pays its division managers a fixed weekly base salary plus a small percentage of the division's volume (no more than 1%) called an overwrite (O.W.). The evidence shows the following division manager salaries to have been in effect at the times indicated:

| | June 1968 | June 1969 |
|---|---|---|
| **Females** | | |
| M. Rolow | $ 77.00 + 1% | $ 82.00 + 1% |
| V. Graybill | 72.00 + 1% | 82.00 + 1% |
| C. Schaller | 77.00 + 1% | 82.00 + 1% |
| N. Lundberg | 75.00 + 1% | 82.00 + 1% |
| E. Blankenhagen | 70.00 + 1% | - - - - |
| **Males** | | |
| G. Prochaska | $ 97.00 + 1% | $102.00 + 1% |
| M. Verchio | - - - - | 110.00 + 1% |
| R. Whiting | 90.00 + 1% | - - - - |
| R. Flack | 90.00 + 1% (as of 9/1/68) - | |
| K. Ryerson | - - - - | 105.00 + 1% |

| | June 1970 | June 1971 |
|---|---|---|
| **Females** | | |
| M. Rolow | $105.00 + ¾ % | - - - - |
| V. Graybill | 102.00 + ¾ % | $102.00 + ¾ % |
| C. Schaller | 97.00 + ¾ % | 106.00 + ¾ % |
| N. Lundberg | 105.00 + ¾ % | 117.00 + ¾ % |
| A. Quist | - - - - | 91.00 + ½ % |
| **Males** | | |
| M. Verchio | $135.00 + ¾ % | $145.00 + ¾ % |
| K. Ryerson | 120.00 + ¾ % | 130.00 + ¾ % |
| T. Segreto | 120.00 + ¾ % | 127.00 + ¾ % |
| J. Christians | - - - - | 98.00 + ¾ % |

| | June 1972 | June 1973 | June 1974 |
|---|---|---|---|
| **Females** | | | |
| V. Graybill | $117.00 + ¾ % | $140.00 + ¾ % | $150.00 + ¾ % |
| C. Schaller | 120.00 + ¾ % | 140.00 + ¾ % | 148.00 + ¾ % |
| N. Lundberg | 125.00 + ¾ % | 150.00 + ¾ % | 185.00 + ½ % |
| A. Quist | 99.00 + ½ % | 140.00 + ½ % | 150.00 + 4/10% ( |
| **Males** | | | |
| T. Segreto | $132.00 + ½ % | $142.00 + ½ % | $156.00 + ½ % |
| K. Ryerson | 140.00 + ½ % | 150.00 + ½ % | 160.00 + ½ % |
| J. Christians | 104.00 + ¾ % | - - - - | - - - - |
| M. Brown | - - - - | 110.00 + ¾ % | - - - - |

The evidence shows all division managers in the Fort Dodge Sears store to be primarily responsible for the merchandising, operating, inventory control, display, training, and supervision of duties relative to their respective division or divisions. Their primary duties have been to

sell, perform the bookwork necessary to keeping the stock replenished and inventoried, mark prices on merchandise up and down, shop competition, assist with advertising and display, supervise the salespersons assigned to assist them, keep their divisions stocked and orderly, prevent shoplifting and handle customer complaints. While these primary duties have varied somewhat in their details from division to division, in a general sense these variations have not affected the basic content of the job or the basic sameness of the degree of skill, effort and responsibility required to perform the jobs. Division managers receive the same manual for training and guidance, and are expected to manage additional divisions or to switch to management of an entirely new cluster of divisions as they are assigned, without prior experience in the management of such newly assigned divisions.

■ The Court deems that the evidence in this case is more than ample to justify the conclusion that the Secretary has carried his burden of proof as to the *general equality* of division manager jobs at the Fort Dodge store. Through the testimony of numerous past and present Fort Dodge division managers, the plaintiff has shown that while no two division manager jobs are wholly identical, they are substantially equal in terms of skill, effort and responsibility. *See Corning Glass Works v. Brennan,* 417 U.S. 188, 195–96, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974). *See also Brennan v. City Stores,* 479 F.2d 235, 238–40 (5th Cir. 1973).

■ This conclusion as to the general equality of division manager positions by no means ends the Court's inquiry. Once a prima facie case of equality has been made, the burden shifts to the employer to show that any wage differentials that exist are justified under one of four exceptions contained within the Equal Pay Act. *Corning Glass Works, supra,* 417 U.S. at 196–97, 94 S.Ct. 2223. Section 206(d)(1) allows the payment of unequal wages for the same work when made pursuant to "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any factor other than sex."

The defendant has presented this Court with a great deal of evidence, both in negation of the Secretary's prima facie case, and affirmatively under the § 206 exceptions. Considering all the evidence in the case, the parties' dispute as to the equality of division manager jobs in essence boils down to two issues: first, the significance of the differences in inventory replenishment methods utilized by certain division managers, and second, the significance of various "extra duties" carried out by certain male employees of Sears.

As a retail store, the ability of Sears to meet its customers' needs depends a great deal on the store's merchandise-ordering efficiency. Sears division managers, under the supervision of their establishment's merchandise manager, are each primarily responsible for the mechanics of the selection and ordering of merchandise within their division or divisions. John Arko, the merchandise manager at the Fort Dodge store, was called as a witness by the defendant to describe the inventory control methods used at the store by the division managers in issue. It is Sears' contention that the use of different ordering systems by certain managers is a significant enough variation of job content to justify some of the pay differentials in dispute. The Secretary contends that any differences in the systems used are an insufficient basis on which to justify the higher salaries of some of the male division managers.

Two primary methods of inventory control were utilized at the Fort Dodge store from 1968 to 1974. These are the "unit buying control system" (Control Book) and "seasonal unit sales plan" (Central Distribution) methods. Under Central Distribution, Sears' parent merchandising office in Chicago utilizes a computerized ordering system to provide each participating unit in every Sears establishment with a seasonal "plan" as to what merchandise will be sold in that unit at that particular time. Once the

plan is put into operation in any given division, tickets from items subsequently sold are sent to Chicago, and the computer is kept current as to the sales activity in that division. Based on the sales in any particular season, and fashion trends perceived by Sears' merchandisers, a new plan is then developed by the parent organization to be sent to each unit for the next season's inventory.

The Control Book method is undeniably less centralized. Control Book division managers are provided with information on general sales trends regarding particular items by the parent organization. Using this information as a guide, the division manager exercises his or her discretion as to the kinds and quantity of merchandise to order at any particular time. While a Control Book division manager's ordering decisions are subject to review by both the store's merchandise manager and the parent office, there clearly is an area of decision-making delegated to a Control Book manager which is not possessed by a Central Distribution manager. Control Book managers also must do the extra amount of paper work which is involved in entering the appropriate figures on Control Book pages.

■ Based upon the testimony of the various division managers, and especially on the testimony of merchandise manager Arko, the Court finds that a division manager who orders merchandise under the Control Book system is faced with a more difficult task than a division manager utilizing a Central Distribution scheme. This finding, however, does not *ipso facto* validate the variance in salaries paid to the male Control Book managers and female Central Distribution managers at issue. When analyzed in terms of all the division managers in issue, the two inventory control methods simply do not constitute the legitimate non-sex-based wage factor Sears claims them to be. In terms of the Equal Pay Act, the actual salaries paid to the division managers fail to support defendant's claim that the differences in inventory control methods which do exist are a suf-

ficient basis on which to conclude that different skill, effort, and responsibility is required from Control Book divisions, as opposed to Central Distribution divisions.

■ Initially it must be remembered that inventory control is merely one of the numerous responsibilities carried out by all division managers. As this Court's previous finding reflects, division manager jobs, in general, share a substantial number of virtually identical responsibilities. As a difference going only to one facet of a division manager's job, inventory control differences can best be treated as "extra duties" added to the same jobs for purposes of the Equal Pay Act. The differences in the methods, by themselves, are too insubstantial a basis on which to conclude that the job of Control Book division manager is *per se* a different job from Central Distribution division manager, justifying a higher wage.

In *Brennan v. Prince William Hospital Corp.*, 503 F.2d 282 (4th Cir. 1974), the Court set out the following guidelines in considering the "extra task" issue under the Equal Pay Act:

Higher pay is not related to extra duties when one or more of the following circumstances exists:

(1) some male employees receive higher pay without doing the extra work;

(2) some females also perform the same extra duties (and do not receive commensurate pay);

(3) qualified females are not given the chance to perform the extra duties;

(4) the extra duties do not in fact exist;

(5) the extra duties consume a minimal amount of time, and are of peripheral importance;

(6) others who do the extra duties as their primary task are paid less than the male employees in question.

*Id.* at 286.

Applying these standards to the employees at issue, and considering first the

female division managers' inventory methods, the record shows thàt some managed 100% Central Distribution divisions, some managed 100% Control Book divisions, and some managed divisions utilizing both Control Book and Central Distribution ordering. These inventory method differences, however, have not been reflected in the women's salaries. For example, in June of 1968, division managers Marguerite Rolow and Clarice Schaller were both earning $77.00 per week, with a 1% overwrite. Rolow managed four Central Distribution divisions, however, while Schaller managed one Control Book division and one division which was 90% Control Book and 10% Central Distribution. In June of 1969, female division managers Rolow, Schaller, Graybill and Lundberg were all earning $82.00, plus 1% overwrite. In terms of inventory control methods, however, Rolow's divisions were 100% Central Distribution, Lundberg's were 100% Control Book and Schaller's and Graybill's were mixed. These differences, however, were not reflected in the women's salaries.[1]

■ In contrast, of the three comparable male division managers working in 1968, only one utilized 100% Control Book methods, as did Ms. Lundberg. All three, however, Prochaska, Whiting and Flack, were paid substantially more money per week (Prochaska, $97.00 + 1%; Whiting, $90.00 + 1%; Flack, $90.00 + 1%). Moreover, the men's salaries do not reflect the differing inventory methods they utilized. A comparison in terms of other years yields the same inconsistent results. (For example, the salaries of Lundberg and Rolow were the same in 1970, yet their inventory methods were 100% Control Book and 100% Central Distribution, respectively.) Based on the foregoing, it is this Court's conclusion that the differing inventory control methods utilized by the Fort

Dodge store division managers do not constitute a permissible, non-sex based differential justifying the higher salaries paid to Sears male division managers in 1968, 1969, 1970 and 1971, nor do they rebut the Secretary's prima facie case under 29 U.S.C. § 206. *See Hodgson v. Brookhaven General Hospital,* 436 F.2d 719, 724–25 (5th Cir. 1970). In terms of the *Prince William Hospital* guidelines, some men who did not have the extra Control Book duties were paid more than some women who did; further, the salaries paid to individuals of the same sex not having the same inventory duties do not reflect the allegedly valid differential. Thus, the Court concludes that the various differences in inventory control methods do not constitute a permissible non-sex-based factor on which to justify the higher salaries paid to men.

■ As a second major area of dispute concerning division manager job equality, the parties disagree as to the significance of certain "extra duties" (wholly aside from the inventory control duties just discussed) performed by some male managers but not by the female managers. It is the Court's conclusion that as to two of the male managers, Gary Prochaska and Michael Verchio, the extra duties performed were sufficiently demanding to set their jobs apart from all other division managers, both male and female, in terms of skill, effort, and responsibility. The extra duties performed by all other division managers during the period at issue were incidental and sporadic, and thus constitute an insufficient basis on which to justify the higher division manager salaries paid to certain men.

Even the plaintiff has conceded that Prochaska and Verchio "were assigned a greater variety of . . . extra duties than other division managers under comparison." (Plaintiff's Post Trial Brief, at 22.) The effect of these duties,

1. As a further refinement, Sears has attempted to distinguish between seasonal Control Book divisions and stable Control Book divisions. To the Court, this smacks of an "overly nice distinction" which, if accepted, would allow employers to "evade the Act at will." *Brennan v. Prince William Hospital,* 503 F.2d at 285. Further, Sears' salaries do not reflect such a distinction.

when considered as a whole, is to set these two men apart in terms of Equal Pay Act comparisons. Both men were "store trainers," conducting orientation sessions of approximately three hours each to acquaint new salespeople and division managers with the Sears store. They made trips to the bank in the evenings, were assigned to a special shoplifting prevention crew, interviewed job applicants and made recommendations respective thereto, locked up the store at night, and occasionally were left in charge of the entire store. In addition to these recurring duties, each man was also involved in more sporadic extra activities, such as handling United Fund drives, making sales outside the store, coordinating yearly inventories, and arranging special promotional sales. These duties, taken together, are clearly sufficient to set Prochaska and Verchio apart from the other division managers in terms of job skill, effort, and responsibility. Their positions, while apparently not specifically so entitled, were akin to management trainee jobs. *Cf.* 29 C.F.R. § 800.148. No other division managers, *male or female,* performed an equivalent amount of extra tasks. Accordingly, the Court now finds that a prima facie case has not been made under the Act as to male division managers Prochaska and Verchio.

The extra duties assigned to some male employees, however, do not validate the higher salaries of other male employees who did not share equivalent burdens. As to male division managers Whiting, Ryerson, Flack and Segreto, the Court concludes that whatever extra duties they engaged in were merely "incidental" to their jobs, and not a sufficient factor on which to justify salaries higher than those of their female counterparts. *Cf. Prince William Hospital, supra,* at 288–290.

In this regard, the Court rejects defendant's argument that the duties of marking alterations on men's suits and supervising the tailor in the men's clothing divisions set that division's management job apart from the comparable position in women's wear. *See Brennan v. City Stores,* 479 F.2d 235 (5th Cir. 1973). Sears' men's and women's clothing personnel share a sufficient congruence of duties to make their jobs substantially equal in terms of skill, effort and responsibility.

Sears' efforts to extend the extra duties argument to other male division managers must also fail because Sears' salaries did not reflect the extra duties that clearly *were* performed by some women managers. For example, Marguerite Rolow was involved in storewide and locally televised fashion shows, activities equally as demanding as the incidental extra duties engaged in by managers Whiting, Ryerson, Flack and Segreto, yet her salary was not enhanced as a result.

On the whole, the extra duties carried out by the men and women division managers (other than Prochaska and Verchio) were simply too few and too similar in nature to justify the conclusion that different work within the meaning of the Equal Pay Act was performed as a result thereof. In terms of the *Prince William Hospital* guidelines, some males received extra pay without doing the extra work, some women did the extra work and did not receive extra pay, and some of the tasks involved were of marginal importance.

Based on the foregoing treatment of the defendant's inventory control and extra duties arguments,[2] the

2. The Court also rejects defendant's contention that the "greater experience" of certain of the male managers justified their higher salaries. Sears does not contend that a bona fide "seniority" system was in existence prior to 1972. *See* 29 U.S.C. § 206(d)(1)(i). Rather, Sears has argued that particular individuals, such as Kenneth Ryerson, possess such an extensive background in their fields that a higher salary is thereby justified. The Court does not deny the fact that Mr. Ryerson, because of his experience running a lodge prior to joining Sears,

Court now finds that for the period preceding implementation of Sears' affirmative action plan, the following division managers performed, under similar working conditions, jobs entailing substantially equal skill, effort and responsibility:

| Females | Males |
|---|---|
| Marguerite Rolow | Thomas Segreto |
| Virginia Graybill | Richard Whiting |
| Clarice Schaller | Kenneth Ryerson |
| Norma Lundberg | Richard Flack |
| Adeline Quist | John Christians |
| Erna Blankenhagen | |

## SALESPERSONS 1968–1972

The Secretary alleges Equal Pay Act violations involving twenty-one Fort Dodge store salespersons: 13 women and 8 men. Since at least April 30, 1968, the males and females listed below have performed the following sales duties at the Fort Dodge store:

| | FEMALES | DATES OF ASSIGNMENTS AND DIVISIONS TO WHICH ASSIGNED |
|---|---|---|
| 1. | Ella Brabbitt | 9/67 to 7/69, #24, Draperies, Bedspreads, Slipcovers. |
| 2. | Phyllis Beadle | 9/67 to present, #42, 64, 65, Plumbing and Heating, Building Materials, Kitchen Cabinets, Dishwashers. |
| 3. | Marguerite Hammes | 7/67 to present, #11, 30, 34, Housewares, Paints, Electrical Supplies. |
| 4. | Beulah Kimm | 1/67 to 7/69, #18, 38, Foundations, Lingerie. |
| 5. | Adeline Quist | 7/67 to 1/71, #7, 17, 19, 31, Juniors' and Women's Wearing Apparel. |
| 6. | Greta Williams | 6/70 to present, #29, 77, Infants', Children's, Girls' and Young Juniors' Wearing Apparel. |
| 7. | Rosetta Shelledy | 6/70 to present, #11, 30, 34, Housewares, Paints, Electrical Supplies. |
| 8. | Jean Gilbert | 5/72 to present, #21, 24, 96, Gifts and China, Draperies, Bedspreads, Slipcovers, Domestics, Blankets, Bed Pillows, Bath Shop. |
| 9. | Phyllis Wilson | 4/68 to 6/70, #29, 77 Infants', Children's, Girls' and Young Juniors' Wearing Apparel. |
| 10. | Janet Adams | 12/70 to 5/72, #24, 96, Draperies, Bedspreads, Slipcovers, Domestics, Blankets. |
| 11. | Connie Gilmore | 12/70 to 5/72, #15, Shoes. |
| 12. | Janet Kleber | 9/69 to 2/72, #24, 96, Draperies, Bedspreads, Slipcovers, Domestics, Blankets, Bed Pillows, Bath Shop; 2/72 to present, #7, 17, 19, 31, Juniors' and Women's Wearing Apparel. |
| 13. | Cheryl Ott | 1/68 to 8/68, #24, Draperies, Bedspreads, Slipcovers. |

| | MALES | DATES OF ASSIGNMENTS AND DIVISIONS TO WHICH ASSIGNED |
|---|---|---|
| 1. | Kenneth Ryerson | 4/67 to 11/68, #6, Sporting Goods. |
| 2. | Richard Kuhn | 6/68 to 9/68, #30, 34, Paints, Electrical Supplies. |
| 3. | Marion Lester Brock | 4/68 to 10/69, #42, 64, 65, Plumbing and Heating, Building Materials, Kitchen Cabinets, Dishwashers. |
| 4. | John Christians | 2/71 to 6/71, #9, Hardware, Power Tools, Lawn Equipment. |
| 5. | Clyde Hewitt | 8/70 to 3/71, #33, 40, 41, 45, Boys' and Men's Wearing Apparel. |
| 6. | Michael Brown | 6/72 to 10/72, #6, 49, 71, Sporting Goods, Toys, Garden. |
| 7. | Lee Spatgen | 11/68 to 1/69, #33, 41, 45, 51, Men's Furnishings, Men's Work Clothing, Men's Casual Wear, Suits and Coats. |
| 8. | Michael Flynn | 10/69 to 12/69, #42, 64, 65, Plumbing and Heating, Building Materials, Kitchen Cabinets, Dishwashers. |

Sears has paid the salespersons listed above a fixed weekly base salary plus a 1% commission on personal sales. The evidence shows the following salaries to have been in effect at the times indicated:

| Females | June 1968 | June 1969 | June 1970 |
|---|---|---|---|
| E. Brabbitt | $ 78.00 | $ 82 00 | $ – – – |
| P. Beadle | 68.00 | 73.00 | 86.00 |
| M. Hammes | 68.00 | 73.00 | 85.00 |
| B. Kimm | 65.00 | 70.00 | – – |
| A. Quist | 65.00 | 75.00 | 81.00 |
| P. Wilson | 68.00 | 73.00 | 79.00 |
| C. Ott | 64.00 | – – – | – – – |
| G. Williams | – – – | – – – | 86.00 |
| R. Shelledy | – – – | – – – | 81.00 |
| J. Kleber | – – – | – – – | 77.00 |

possesses a wealth of information about sports and hunting which he can utilize to the store's benefit in its sporting goods department. This attribute, however, while on its face constituting a "factor other than sex" within 29 U.S.C. § 206(d)(*1*)(iv), was not neutrally applied. Sears made no comparable efforts to reflect the prior backgrounds of its women division managers in their salaries. Had it so endeavored, the Court is confident that women with domestic backgrounds equally as helpful as Mr. Ryerson's outdoor background could have been found. Moreover, Sears' women's salaries also ignored the extensive retail backgrounds of Managers Rolow and Graybill, who each had approximately ten years of manager experience prior to 1968.

Further, the defendant has wholly failed to establish that its pre-1972 division managers fall within the administrative employee exemption of 29 U.S.C. § 213(a)(1).

| | June 1968 | June 1969 | June 1970 |
|---|---|---|---|
| **Males** | | | |
| K. Ryerson | $ 85.00 | $ – – – | – – – |
| R. Kuhn | 64.00 | – – – | – – – |
| L. Brock | 80.00 | 91.00 | – – – |
| | June 1971 | June 1972 | June 1973 |
| **Females** | | | |
| P. Beadle | $ 95.00 | $ 95.00 | $ 105.00 |
| M. Hammes | 92.00 | 98.00 | 105.00 |
| G. Williams | 86.00 | 92.00 | 100.00 |
| R. Shelledy | 81.00 | 87.00 | 100.00 |
| J. Adams | 81.00 | – – – | – – – |
| C. Gilmore | 74.00 | – – – | – – – |
| J. Kleber | 85.00 | 90.00 | 106.00 |
| J. Gilbert | – – – | 86.00 | 96.00 |
| **Males** | | | |
| M. Brown | $ 80.00 | | |
| J. Christians | 90.00 | | |

The twenty-one salespersons listed above have been primarily responsible to demonstrate the products they sell, interest customers in the top of the line merchandise, answer questions relating to the quality, use, care and maintenance of the products in their divisions, determine the customer's needs and recommend a product which will best fulfill those needs from all of the alternatives available, close both cash and charge transactions, and assist the division managers in inventory and stock work. Those salespersons who have been the only full-time employees in their division (many of the divisions have been staffed almost exclusively with part-time employees) have also been expected to assist in running the division and to supervise the part-time help in the absence of the division managers.

Like the division managers previously discussed, the salespersons' primary duties of selling, performing some clerical work and stock work, handling customer complaints and preventing shoplifting, have varied somewhat in their details, but this has not affected the basic content of the job. The salespersons in Infants' and Children's, Girls' and Young Juniors' Clothing division, Juniors' and Women's Clothing division, and Men's and Boys' Clothing division all have been required to fit clothing to the customer, which requires finding the right size for the customer, having them try the garments on in the fitting rooms, and marking for alterations or recommending alterations for the customer to make at home. In the Infants' and Children's, Girls' and Young Juniors' division, and the Shoe divisions, the salespersons must fit shoes. In the Draperies and Domestics division, the saleswomen under comparison have been required to order draperies from the catalogue, calculate material requirements for made-to-measure draperies which may involve instructing the customer on how to take correct window measurements, advising on the installation of traverse rods, and occasionally estimating the cost of custom-made draperies in the frequent occasions when the decorator is out of the store. In the Housewares, Paints and Electrical division, saleswomen Marguerite Hammes and Rosetta Shelledy have advised customers on preparation of surfaces for painting or furniture refinishing, on the types of paints and applicators to use, have estimated the amount of paint required to cover, have mixed the paints for the customer, and have advised "do-it-yourselfers" on installation of electrical wiring and what the local electrical code forbids. In Sporting Goods, the sales persons have advised customers on various aspects of the sports for which merchandise is sold. Given these general similarities, the Court finds that the variations which do occur in the job details of salespersons which are occasioned by the type of merchandise sold—e.g., mixing paints in the paint division to achieve different colors, making markings on suits in the Men's Dress Clothes division to indicate alteration adjustments, assembling a bicycle or erecting a tent in the Sporting Goods department—are differences which are at best only incidental to the job and which require no significantly greater skill, effort or responsibility than the general type of duties which are commonly performed. Accordingly, the Court deems that the Secretary has made a prima facie showing of general salesperson job equality for purposes of the Act. As was the case with the division manager job equality, however, this conclusion is subject to certain qualifica-

tions, for in the case of certain salespersons, the job differences were more than incidental.

The Secretary has conceded that not all salespersons perform jobs of substantially equal skill, effort, and responsibility. At footnote 37 of plaintiff's post-trial brief, it is stated that the jobs of the salespeople at issue herein have been distinguished from those salespeople (1) who are basically cashiers, i.e., mainly ring up items such as candy; (2) who sell specialized and often expensive merchandise, such as furniture and appliances; and (3) who do predominantly outside the store saleswork. Upon a review of the job content of the twenty-one persons at issue in this case, however, the Court deems that two male salespersons have been included who more properly belong in the excluded categories.

 The first such employee is Marion Lester Brock, who sold in Sears' "Home Improvement Center" (the plumbing and heating, building materials, kitchen cabinet and dishwasher divisions) in 1968 and 1969. Brock came to Sears with a substantial technical background. This factor alone is insufficient to justify his comparatively higher salaries in 1968 and 1969, for Sears made no comparable efforts to compensate its women salespersons for any particular expertise they might have had in their sales areas. Brock's actual duties, however, did set him apart. He dealt with outside contractors who did installation work for Sears involving air conditioners, plumbing products, and home furnaces. His duties in this regard involved collecting the needed materials from within the division, and seeing that the installers had all the items they needed before leaving the store. On days when Brock was not available to gather the appropriate items for the outside installers, division manager Pliner did so. The duties were not assumed by Brock's female counterpart in home improvements, Phyllis Beadle. Further, Brock was involved in assembling in-store displays of furnaces, water heaters, and vanities.

On some occasions, he also left the store to inspect installed items. Mrs. Beadle, in contrast, has spent increasing proportions of her time since 1968 doing clerical work. (The testimony of division manager Pliner indicates that Beadle's clerical work has increased from 40% of her time in 1969 to 90% at present.) Thus, while the two shared a certain amount of equivalent sales duties, they both spent significant amounts of their time in starkly contrasting non-sales pursuits. It is this Court's conclusion that the nature of the divisions in which Brock was employed, and the somewhat technical nature of his duties in those divisions, clearly set him apart from other salespeople for Equal Pay Act comparison purposes. The nature of his duties more closely approaches those of salespeople involved in "specialized and often expensive merchandise," a category the Secretary concedes to be different from the bulk of divisions at issue here. Further, within those divisions, there was a definite de facto division of duties as between Brock and Beadle. Brock's more technical responsibilities adequately justify the disparity in pay for the times involved.

 The other male employee who appears to have been miscategorized by the Secretary for purposes of this suit was also involved in the Home Improvement divisions—Michael Flynn. Mr. Flynn spent from October to December of 1969 as an in-store salesperson in the same divisions as Mrs. Beadle. Flynn was paid $85.00 a week for those two months, while Beadle earned $73.00 per week. It is the Court's conclusion, however, that the defendant has shown that Mr. Flynn was hired by Sears to be an outside salesman, and spent two months within the store so preparing. Through division manager Pliner, the defendant has shown that Flynn's brief in-store stint was to acquaint him with the materials he would need to be familiar with in order to perform outside sales duties. The record further reveals that Flynn did in fact become an outside salesman in December of 1969, at the end of the

two-month period.[3] The Secretary has admitted that outside sales are to be distinguished from inside sales. Given this conceded difference, the Court deems that Flynn's trainee status constitutes a factor other than sex legitimizing his higher salary for the two months involved. *Cf.* 29 C.F.R. § 800.148.

■ As to the other male salespeople at issue, whatever differences that may set their jobs apart from those of their female counterparts are insufficient to justify their higher wages. Sears has argued that in the case of Kenneth Ryerson and John Christians, their special backgrounds, combined with the difficulty of sporting goods and hardware, their respective divisions, justify their enhanced wages. As noted in the case of Brock, the background argument must be rejected, for it is selectively applied. As far as the record reflects, no consideration has been given to the special backgrounds of any of Sears' saleswomen. The difficulties involved in selling sporting goods and hardware items appear to be no different from those encountered in any of the other comparable sales divisions, with the aforementioned exception of home improvements. There is ample evidence that whatever incidental duties these men were forced to perform, their female counterparts faced them also. Accordingly, the Court deems that the defendant's evidence regarding these salesmen and their divisions has been insufficient to offset the Secretary's prima facie case of salesperson job equality.

■ Defendant has attempted to justify the higher salary of Lee Spatgen, who worked in men's clothing from November, 1968 to January, 1969, on the ground that he was hired as a special assistant to division manager Verchio, and as a result performed duties more demanding than other salespersons. The record reveals that the majority of the saleswomen at issue were their divisions' only full-time salesperson. As such, they had duties in assisting their division managers which were equally as demanding as Spatgen's. The differences defendant relies on to support his higher salary do not rebut the Secretary's case-in-chief.

■ Based on the foregoing analysis of the general similarities of the salesperson jobs at issue, the Court now finds that for the period preceding implementation of Sears' affirmative action plan, the following salespersons performed, under similar working conditions, jobs entailing substantially equal skill, effort and responsibility:

| FEMALES | MALES |
|---|---|
| Ella Brabbitt | Richard Kuhn |
| Phyllis Beadle | John Christians |
| Marguerite Hammes | Clyde Hewitt |
| Beulah Kimm | Michael Brown |
| Adeline Quist | Lee Spatgen |
| Greta Williams | Kenneth Ryerson |
| Rosetta Shelledy | |
| Jean Gilbert | |
| Phyllis Wilson | |
| Janet Adams | |
| Connie Gilmore | |
| Janet Kleber | |
| Cheryl Ott | |

## SEARS' AFFIRMATIVE ACTION PLAN

In the summer of 1972, Sears compensation practices underwent a drastic change. By fiat of the Chairman of Sears' Board of Directors, the company implemented its "Equal Pay Affirmative Action Plan for Retail Stores" on a nationwide level. As described by defendants' counsel, prior to implementation of the Plan "local factors, special job duties, wage histories of the employees within Sears, and special backgrounds were evaluated at the local level, and were the predominant force in wage administration." The Plan "reversed that emphasis by essentially establishing an objective formula for determining compensation on a nationwide basis." Defendant's post-trial brief at 2–3.

It cannot be denied that insofar as the Fort Dodge store is concerned, the Plan has had the general effect of raising the

---

**3.** While not directly pertinent to this Equal Pay problem, the Court deems it significant that Beadle, by her own testimony, at no time desired to get involved in outside sales.

salaries of Sears' women employees. Indeed, it is the Court's understanding that with the exception of one minor matter which will be subsequently discussed, the parties agree that the Plan's treatment of salespeople satisfies the plaintiff's Equal Pay Act objections. As to division managers, however, disagreement persists. Accordingly, the Court will proceed to determine first whether the Secretary has established a prima facie case under the Act as to post-1972 division manager wages, and second, whether Sears' nationwide Plan constitutes a "differential based on any other factor than sex" within the meaning of 29 U.S.C. § 206(d)(1)(iv).

Telling evidence of the effects of Sears' Plan is provided by Plaintiff's Exhibit 5–A, which lists the salaries certain counterpart division managers were receiving at the time of trial in this case in July of 1974. The following salaries were then in effect:

| Division Manager | Sex | Salary (per week) |
|---|---|---|
| N. Lundberg | F | $185.00 + 1/2% |
| V. Graybill | F | 165.00 + 1/2% |
| A. Quist | F | 161.00 + 4/10% |
| K. Ryerson | M | 160.00 + 1/2% |
| T. Segreto | M | 156.00 + 1/2% |
| K. Husske * | F | 112.00 + 3/4% |
| K. Ropte * | M | 105.00 + 1/2% |

■ These salaries are vastly different than those in effect from 1968–1972, the period for which the Court has found violations of the Equal Pay Act. For example, in June of 1969 female division managers Rolow, Graybill, Schaller and Lundberg all earned $82.00 per week, plus a 1% overwrite. Kenneth Ryerson's salary was $105.00 + 1% at that time, and one year prior to that division managers Flack and Whiting, both men, were earning $90.00 per week + 1%. Similar results are obtaining by comparing the years 1970, 1971, and 1972. Subsequent to 1972, however, a general equalization was realized, as the 1974 figures attest. In light of this clear trend toward equalization of salaries, the Court rejects as unfounded and contrary to the evidence the Secretary's claim that the 1972 Plan constitutes a mere perpetuation of Fort Dodge store salary practices prior to 1972. In light of the evidence in this case as to women's and men's salaries at the Fort Dodge store subsequent to 1972, even if it is assumed that all the counterpart division managers performed work of equal skill, effort and responsibility, the Secretary has not made a prima facie showing that the defendant has discriminated "between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex." 29 U.S.C. § 206(d)(1). The evidence simply does not show an existing wage preference to Sears' male division managers.

Notwithstanding the absence of a present violation of the Act in the Fort Dodge store, the Secretary contends that the Affirmative Action Plan has fatal shortcomings insofar as future compliance with the Equal Pay Act is concerned. Accordingly, the Court will consider the legitimacy of the Plan as a factor based on a differential other than sex. If a prima facie showing of a violation had been proven, the burden would be on the defendant regarding this affirmative defense. *Corning Glass Works v. Brennan, supra,* 417 U.S. at 196–97, 94 S.Ct. 2223.

Described most simply, Sears' plan is a nationwide rating scheme of the various salesperson and division manager jobs existing in the company's retail stores. In early 1972, a committee of high level Sears employees met in Chicago. By allocating points to fifteen separate salesperson duties and eleven separate division manager duties, median job scores were ascertained by the committee, which ranked sales positions from 57 to 184 points, out of a possible 210 points, and ranked division manager duties from 57 to 185 points, out of a possible 220 points. Salesperson and division manager jobs were then each divided into three grades, based upon the median point totals. Upon completion of this

* The salaries of these individuals are not at issue in this case.

nationwide job grading structure, which was modified somewhat to reflect perceived regional differences, Sears conferred with the Department of Labor regarding the Plan. Certain compromises were made, especially in the area of salesperson job grades, but disagreement still exists.

To secure compliance with the Plan in each of its stores, Sears implemented the "Equitable Pay Package," an auditing mechanism developed to insure uniform application of the new wage scales to all employees. Judith Mittleman and Karen McGuire, auditors within Sears' midwestern territory, have visited the Fort Dodge store since 1972 to oversee compliance with the Plan. Defendant claims that it presently pays the same wage to "all employees in the same job grade in the same store within the same length of service, experience as a division manager, and sales volume." (Defendant's post-trial brief, at 17). The evidence does show that through the Plan, and its auditing mechanism, local store managers have lost the ability to give special compensation to any particular group of employees. A uniform wage scale has superceded local store manager discretion.

 In terms of Fort Dodge store salespersons, one post–1972 disagreement exists. Plaintiff did not contend at trial that presently-employed saleswomen were earning less than presently-employed salesmen in violation of the Act and the evidence produced revealed no such violations. Instead, plaintiff asserts that four of the five saleswomen under comparison in 1974 were earning less money than one salesman—Clyde Hewitt—had made in 1970. It is the Court's conclusion, however, that Hewitt's salary of $125.00 per week in 1970 was so out of line with the salaries of *both* men and women salespeople that it cannot be described as sex-based. Only two other counterpart salesmen were working contemporaneously with Hewitt, and neither one, Brown or Christians, was paid over $100.00 per week. While the reasons for this preferential treatment regarding

Hewitt are somewhat unclear, the Court is convinced that they were not sex-based. Accordingly, plaintiff's attempt to challenge the post–1972 salaries of Sears' saleswomen for the reason that they fall below Clyde Hewitt's unexplained prior high earnings must fail. Moreover, even if Hewitt's salary could be deemed to be impermissibly sex-based, it was paid prior to implementation of the Plan, and therefore has no relevance to the legality of Sears' post–1972 salary determination methods.

 The parties' disagreement regarding division manager remuneration under the Plan is more substantial. Plaintiff argues that even if the salaries of counterpart men and women disclose no present violations of the Act, their jobs are graded in such a way as to allow future abuse. The problem is that certain men's jobs, such as Kenneth Ryerson's, are classified as grade III jobs, while many of the women's jobs are classified in grades I and II. At present rates, grade III jobs can pay up to a maximum of $210.00 per week, while grade II jobs offer a possible maximum of $200.00 a week. Plaintiff asserts that notwithstanding any current Equal Pay Act compliance, Sears can, in the future, raise the salaries of their higher graded male division managers above their female counterparts. In essence, plaintiff is alleging that Sears' Plan cannot be deemed a non-sex based differential under 29 U.S.C. § 206(d)(1)(iv) because it preserves, albeit in a somewhat subtle form, preferential pay rates for men. This argument appears to rest on two premises: (1) that certain jobs within the Sears organization are consistently filled by employees of one sex; and, assuming this to be true, (2) that the "female-oriented" jobs have been graded lower than "male-oriented" jobs.

Regarding the first proposition, a review of the recent history of the Fort Dodge store reveals that, in general, women have held the sales and division manager positions in divisions involving women's clothing items and accessories

(Divisions 4, 7, 8, 17, 18, 19, 25, 31, 75) while men have held the counterpart positions involving items of men's clothing (Divisions 33, 40, 41, 45, 51). A similar pattern of male and female "oriented" placement apparently existed in the Owensboro, Kentucky Sears store. *See* Stipulation of Facts filed in *Hodgson v. Sears, Roebuck & Co.*, Civil No. 2555 (W.D.Ky.) As to most of the other divisions within the store, no clear trend is shown; men and women seem to work in areas outside of clothing without regard to their sex. Notwithstanding this recent history of de facto sex-related job placement at the Fort Dodge store clothing divisions, the testimony of certain Sears employees that men and women are free to hold any job in a Sears store that they want, except clothing model, stands uncontradicted.[4] For the purposes of the second proposition, i. e., whether "female-oriented jobs" have been graded at a lower level than "male-oriented jobs," the Court will thus consider work in men's and women's clothing divisions to be the only Fort Dodge store jobs so categorized.

 Insofar as salespeople are concerned, the jobs of selling in the men's and women's clothing divisions have been ranked in job grade II. Accordingly, no potential Equal Pay Act problems exist as to the sales jobs. The parties' dispute centers on the fact that the Plan (*See* Plaintiff's Exhibit # 25) classifies division manager jobs in men's furnishings, men's slacks, boys' wear and men's dress clothes in job grade II, while the division managers in dresses, girls' wear, women's sportswear, women's coats, and junior women's clothes are classified job grade I, as are the divisions involving women's accessories. Given the past practice of sex-based segregation within the Fort Dodge store as to these jobs, the eventual result of the Plan would be to compensate women at

a lesser rate than men, for jobs this Court has previously found to entail substantially equal skill, effort and responsibility. *See* pages 89–94, *supra*. At the present time, of course, the Court has before it no evidence of existing Equal Pay Act violations as to the Fort Dodge store division managers. The disparity of job grades regarding division managers of the Fort Dodge store's men's and women's clothing divisions, positions which have in the past been held by men and women, respectively, indicates to the Court that at least *as to those positions,* the sex factor has influenced their grading. Therefore, were the Court directly faced with an existing pay discrepancy involving the Fort Dodge store division managers of men's and women's clothing, with the job grades of the defendant's Plan being urged as a defense, that defense would be rejected. The nearly systematic placement of women-oriented jobs in a grade lower than the male-oriented jobs would force the Court to conclude that the grading had been affected by "traditional notion that women, because of their principal roles as wives and mothers, must occupy an employment status second to men." *Hodgson v. Security National Bank of Sioux City,* 460 F.2d 57, 63 (8th Cir. 1972). Because no post-1972 prima facie showing of a § 206 violation has been established, the Court's comments on the Plan's acceptability as a § 206(d)(1)(iv) exception are offered solely for the parties' future use. Were the Court directly faced with the issue of the Plan as a permissible non-sex-based factor, it would hold that in general the defendant had sustained its burden of proof regarding a neutral rating system. This is clearly not a case where an employer has devised a plan or formula for determining the salaries of members of one sex, and not applied it to members of the other. *See Board of Regents v. Dawes,* 522 F.2d 380, 384 (8th Cir. 1975).

---

**4.** The Court recognizes the matter of sex preferences in job placement within a store to be primarily a Title VII problem, rather than an Equal Pay Act issue. *See generally, The Equal Pay Act of 1963: A Practical Analysis,* 24

Drake L.Rev. 570, 607–10 (1975). Since this is not a Title VII case, the issue is being considered solely for its relevance to the Plan's validity as an exception to the Equal Pay Act.

The Plan is applied to everyone. Its shortcoming appears to be a general preference to "male-oriented" jobs. The crucial finding of this case in terms of future Fort Dodge store liability is the past trend within that store to place men and women in certain divisions because of their sex. As the United States Courts of Appeals for the Eighth and Sixth Circuits have noted, the requirements for an exception to § 206 will not be met "unless the factor of sex provides no part of the basis for the wage differential." *Hodgson v. Security National Bank*, 460 F.2d at 59; *Brennan v. Owensboro-Daviess County Hospital*, 523 F.2d 1013, 1031 (6th Cir. 1975), citing 29 C.F.R. 800.142. Considering the past history of job placements in the Fort Dodge store, the defendant has not satisfied this burden.

▇ The complaint in this cause of action alleges Equal Pay Act violations in the defendant's Fort Dodge store, which is only one of defendant's 900 retail establishments across the country. This in itself is not surprising, since the complaint was filed prior to implementation of the Sears' nationwide Plan, and the company's pre-Plan payment schemes were localized in terms of its various retail outlets. It is apparent from the proceedings herein that plaintiff deems defendant's uniform plan to provide a sufficient basis for a nationwide injunction against the company. To reach this end, plaintiff would have the Court infer present and future nationwide violations of the Equal Pay Act from the existence of present and future violations in Fort Dodge. This effort must be rejected, for it is wholly without support in the record.

As previously ruled herein, no present violation is occurring in Fort Dodge. The Court has ruled, however, that if past practices of male and female oriented placement continue unchanged in Fort Dodge, future violations will occur. The question thus comes down to whether the evidence produced at trial supports a finding that future violations are likely to occur at other Sears' establish-

ments. It is the Court's conclusion that no such inference can be made.

In defense of its Plan, Sears has argued that every one of its division manager jobs is open to both men and women. This assertion is supported in the record by the testimony of Con Massey and Judith Mittleman. The record also reveals that at least one so-called "female-oriented" division, children's and young girls' clothing, has had male division managers in other Sears stores. Moreover, even if a nationwide male and female oriented job structure is assumed, the supposed preference for male-oriented jobs is not absolute. Men's work clothing is a grade I job, while the infants' and children's and blankets and bath shop divisions are grade II. In response to these arguments of the defendant, plaintiff has presented little more than the evidence pertaining to Fort Dodge: one unit out of 900. To the Court, evidence of Sears division manager placement practices in Fort Dodge was crucial to the finding of a likely future violation. Given the absence of any such evidence as to other Sears establishments, and particularly in light of Sears' strenuous arguments that its nationwide job placement policies are not sex-based, the Court deems that it would be wholly improvident to infer Equal Pay Act violations on a national scale solely on the basis of one establishment's recent practices. The Court rejects plaintiff's implication that the existence of the Plan, by itself, is sufficient to give this case a nationwide scope.

To summarize, the evidence produced in this case on the issue of liability establishes Equal Pay Act violations regarding Fort Dodge store salespersons and division managers prior to 1972. The record reveals no post–1972 Fort Dodge store violations, but it does indicate a likely future violation in Fort Dodge if past practices continue unabated. The record does not support a finding of any present or future violations of the Act in any other Sears store.

## REMEDY

By prior order, matters of liability and remedy have been severed in this case. The Court has today found Equal Pay Act liability on the part of Sears only for the period prior to implementation of the 1972 plan. The parties must now address the issue of remedying those violations. The Court will at this time direct a few remarks to that issue to facilitate final disposition of this cause.

Initially, it should be noted that there is no real dispute as to the preferential salary payments made to men from 1968 to 1972. Indeed, the payments already made by Sears recognize the fact that on the whole, men received a higher wage than women.

 Having heard a substantial amount of evidence in this case pertaining to Sears' efforts to comply with the Equal Pay Act, the Court has no doubts that the company was acutely aware of its provisions. Accordingly, under the authority of *Brennan v. J. M. Fields,* 488 F.2d 443 (5th Cir.), *cert. denied,* 419 U.S. 881, 95 S.Ct. 146, 42 L.Ed.2d 121 (1974), and *Coleman v. Jiffy June Farms,* 458 F.2d 1139 (5th Cir. 1970), the Court holds that the three-year limitations period for willful violations shall govern the pre-1972 aspects of this action. 29 U.S.C. § 255(a). Thus, back pay liability will commence from April 30, 1968.

Insofar as the employees who have been found to have performed equal work between 1968 and 1972 are concerned, the Court is not ruling today that for remedial purposes they must all be retroactively awarded the same wage. As was noted in *Hodgson v. City Stores,* 332 F.Supp. 942, 951 (M.D.Ala.1971), *aff'd* 479 F.2d 235 (5th Cir. 1973), adjustments should properly be made for experience with the company in computing the remedial wage. *See also Brennan v. Victoria Bank & Trust Co.,* 493 F.2d 896, 903 (5th Cir. 1974). In this regard, and consistent with prior findings herein, the wages of Clyde Hewitt should not be considered in computing the appropriate monetary relief for female salespersons, due to the unrepresentative nature of his salary.

It is the Court's understanding that the parties have already reached agreement as to most if not all of the 1968–1972 pay disparities. Accordingly, the parties will be given until Friday, February 6, 1976 to attempt to adjust the payments previously made to the findings and conclusions herein. The parties shall also submit written suggestions to the Court by that date as to the need, if any, for further remedy-related proceedings in this cause.

It is so ordered.